1        UNITED STATES DISTRICT COURT
         DISTRICT OF NEW JERSEY
2         Civil Action No. 08-337

3   ------------------------------

4   In Regard to the Matter of:

5   Bayside State Prison           OPINION/REPORT
    Litigation                        OF THE
6                                  SPECIAL MASTER
    PASQUALE MARINO
7
           -vs-
8                                   RECEIVED
    WILLIAM H. FAUVER, et al,
9
           Defendants.            DEC 1 2 2008
10  ------------------------------    AT 8:30_____M
                                      WILLIAM T. WALSH
11                                        CLERK

12

13

14            *       *       *       *

15       FRIDAY, NOVEMBER 21, 2008

16            *       *       *       *

17

18

19

20  BEFORE THE HONORABLE JOHN W. BISSELL, SPECIAL MASTER

21

22

23

24

25

1

2

3

4          Transcript of proceedings in the above

5   matter taken by Theresa O. Mastroianni, Certified

6   Court Reporter, license number 30X100085700, and

7   Notary Public of the State of New Jersey at the

8   United States District Court House, One Gerry Plaza,

9   Camden, New Jersey, 08102, commencing at 11:46 AM.

10

11

12

13

14

15

16

17

18          MASTROIANNI & FORMAROLI, INC.

19     Certified Court Reporting & Videoconferencing

20              251 South White Horse Pike

21            Audubon, New Jersey 08106

22                 856-546-1100

23

24

25

A P P E A R A N C E S:


    ROSELLI & GRIEGEL, PC
    BY:   JAMES LAZZARO ESQUIRE
        and
    BY:   CHARLES J. MOORE, ESQUIRE
    1337 STATE HIGHWAY 33
    HAMILTON SQUARE, NEW JERSEY  08690
    609-586-2257
    ATTORNEYS FOR THE DEFENDANTS


    JAIME KAIGH, ESQUIRE
    32 NORTH BLACK HORSE PIKE
    BLACKWOOD, NEW JERSEY  08012
    856-232-3337
    856-232-4561
    ATTORNEYS FOR THE PLAINTIFFS


    RODNEY D. RAY, ESQUIRE
    32 NORTH BLACK HORSE PIKE
    BLACKWOOD, NEW JERSEY  08012
    856-232-3337
    856-232-4561
    ATTORNEYS FOR THE PLAINTIFFS

1          JUDGE BISSELL:  I'm now reopening

2    proceedings in the case of Pasquale Marino, docket

3    number 08-337.

4          This opinion/report is being issued

5    pursuant to the directives of the Order of Reference

6    to a Special Master and the Special Master's

7    Agreement and the guiding principles of law which

8    underlie this decision to be applied to the facts

9    upon which it is based as set forth in the jury

10   instructions in the Walker and Mejias jury charges to

11   the extent applicable to the allegations of Mr.

12   Marino.

13          As finalized after review under Local

14   Civil Rule 52.1, this transcript will constitute the

15   written report required under paragraph seven of the

16   Order of Reference to a Special Master.

17          Pasquale Marino was housed in Trailer

18   Four E and he recounts at length and in depth a

19   beating which he took first in his bunk and then in

20   his day room as he alleges by SOG officers who

21   extracted him due to, as he states it, mistakenly

22   identifying him as one who made a particular

23   utterance that might have led to disruption and,

24   indeed, further consequences regarding the inmate

25   population on his wing.

1            He describes an extensive beating which

2   one would have expected would have left marks.

3   Indeed, he even claims to have fainted as a result of

4   the offense in question.

5            However, there are other aspects of the

6   evidence presented in this record as a whole which

7   cast sufficient doubt upon the accuracy of Mr.

8   Marino's testimony as to lead to a conclusion that he

9   has failed to sustain his burden of proof in this

10  matter by a preponderance of the evidence.

11           As I've said, he described a

12  particularly aggravated and lengthy beating which

13  could not have failed to have left marks of some kind

14  on him.  And by the way, he was being extracted at

15  this time for relocation to B Unit as a result of

16  statements attributed to him.  I'll get into those in

17  a minute.

18           However, he was taken immediately to

19  the infirmary on the way to the B Unit Ad-seg and the

20  entry of the nurse in connection with that visit to

21  the infirmary showed no indication of any problems

22  whatsoever.  Hers was essentially a routine

23  inspection for purposes of his transfer to B Unit.

24  And yet the purpose of this inspection was, indeed,

25  to reveal whether there were any injuries whatsoever

1   to this inmate going in to B Unit.  The reason for

2   that is obvious, because if there are injuries of

3   some kind noted on the way in, it could never

4   eventually be argued that they were inflicted upon

5   him while he was at B Unit.  None noted in

6   plaintiff's own exhibit, P-100.

7               Secondly, corrections Officer DuBois

8   was in the Trailer Four unit assigned to its

9   supervision at that time.  I find that his testimony

10  about what Mr. Marino yelled out in the course of

11  these events is credible.  It is not likely, frankly,

12  that he would have made a mistake as to the person

13  who did the yelling in such a serious matter as this

14  or that he would have allowed the SOGs to proceed

15  cavalierly just to arrest anybody who may have made

16  these remarks.

17              It was important to Dubois as the

18  supervisor of the unit to make sure that the right

19  person who had undertaken this disruptive conduct was

20  the one removed.  He issued a contemporaneous report

21  entered into evidence as D-248 and I will take a

22  moment to read from it.

23              Dated July 31st, 1997, the day after

24  Officer Baker was killed and at the very outset,

25  really, of the lockdown procedure.  I'll have a

1    little more to say about that as well in a few

2    minutes.

3              He writes in the description of the

4    alleged infraction on D-248 as follows:  "On the

5    above date and time this officer heard inmate yelling

6    on inmate 4 East wing, 'Oh, Baker, oh, Officer

7    Baker,' over and over again.

8              Upon entering the wing, all became

9    quiet except for Inmate Bryce, number nine hundred,

10   who continued his chanting of the above.

11             I ordered Inmate Bryce, nine hundred,

12   to stop.  And at this time Inmate Marino, 269569, who

13   is two beds away from Inmate Bryce, nine hundred,

14   yelled out, 'Fuck them.  What happened, happened.  If

15   they don't like it, we'll tear this place apart.' At

16   this point I called for a supervisor who responded

17   with SOG and removed both inmates from the wing."

18             I find that the testimony and

19   contemporaneous exhibits generated by the SOG

20   officer, Mr. Romer, regarding the resistance of Mr.

21   Marino to extraction from his cell, as well as his

22   resistance and conduct while walking to the

23   infirmary, was also credible.  Indeed, he also

24   prepared contemporaneous reports, D-250 and D-251.

25   Each of them is a disciplinary report, one with

regard to Mr. Marino's resistance to being cuffed and
extracted from the cell, the other with regard to his
conduct on the way to the infirmary.

In addition, the record reveals that
after Mr. Marino cleared the infirmary and was sent
to B Unit, unlike a lot of persons held for charges,
he was immediately shipped out the next day to
Northern State Prison.  Eventually the court line
hearing on the charges against him, which included
the charge of encouraging others to riot written up
by officer Dubois and the other two resistance
charges written up by Mr. Romer, was conducted at
Northern State.  He was found guilty of those charges
at that institution.

I find that the fact that Mr. Marino
was, indeed, immediately shipped out of Bayside is
consistent with the accuracy of the testimony offered
by the defense that indeed it was he who
intentionally yelled out this very dangerous
statement which could have led to resistance and
other inappropriate activity from those on his unit
who were within earshot.

There are other aspects of the
circumstances here, particularly in light of the fact
that we are at the very outset of a lockdown, which I

1   find also support the accuracy of the events as

2   recounted by the defendants' witnesses.

3              To be sure, the tension level was high

4   and the anger level of corrections officers was high,

5   in light of the death of one of their own only a day

6   before.  But also, there was an extremely high level

7   of vigilance and scrutiny throughout the institution

8   at this time.  And surely the corrections officers

9   and SOG officers were well aware of that, too.  Their

10  conduct, as well as that of each inmate, was very

11  much under a microscope here.  They were at the

12  outset of a lockdown period of indefinite duration

13  which was going to require a considerable amount of

14  transport and other contact between corrections

15  officers and inmates, more so than would normally

16  take place.

17             Frankly, I don't see Officer Dubois

18  risking his career by permitting the type of beatings

19  described by the plaintiff which would have been in

20  his plain view in the day room on his shift at this

21  trailer.  I don't see Officer Romer, who himself had

22  previously been a Bayside Prison Corrections Officer,

23  although now stationed elsewhere and coming in with

24  the SOG unit, a person who knew a lot of the

25  corrections officers at Bayside and was the SOG unit

1  leader in connection with this extraction, putting
2  his fellow officers, himself and, indeed, the whole
3  operation to secure and stabilize Bayside State
4  Prison at risk with a beating of this sort.  It just
5  doesn't make sense.
6          Accordingly, Mr. Marino's testimony
7  stands alone in the face of this other evidence
8  including the testimony of the defense witnesses that
9  the extraction did not involve conduct of that sort
10  whatsoever.  At the very least, Mr. Marino has failed
11  to sustain his burden of proof by a preponderance of
12  the evidence that the beatings which he described
13  ever took place.
14          Finally, although not every item of
15  evidence has been discussed in this opinion/report,
16  all evidence presented to the Special Master was
17  reviewed and considered.
18          For the reasons set forth above, I
19  recommend in this report that the district court
20  enter an order and judgment of no cause for action
21  with regard Pasquale Marino.
22
23
24
25

```
1                    C E R T I F I C A T E

2

3        I, Theresa O. Mastroianni, a Notary Public and

4   Certified Shorthand Reporter of the State of New

5   Jersey, do hereby certify that the foregoing is a

6   true and accurate transcript of the testimony as

7   taken stenographically by and before me at the time,

8   place, and on the date hereinbefore set forth.

9        I DO FURTHER CERTIFY that I am neither a

10  relative nor employee nor attorney nor counsel of any

11  of the parties to this action, and that I am neither

12  a relative nor employee of such attorney or counsel,

13  and that I am not financially interested in the

14  action.

15

16

17

18

19  __JD Mastroianni__
    Theresa O. Mastroianni, C.S.R.
20  Notary Public, State of New Jersey
    My Commission Expires May 5, 2010
21  Certificate No. XI0857
    Date: December 8, 2008
22

23

24

25
```